**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

           **-v-**                                          **15-CR-98G**

**JUDY BERRY,**

        **Defendant.**

_____

## DECISION AND ORDER

This case was referred to the undersigned by the Hon. Frank P. Geraci, Jr., in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report on dispositive motions.

## PRELIMINARY STATEMENT

The defendant is indicted along with a number of co-defendants wherein she is charged with having violated 21 U.S.C. § 846, narcotics conspiracy. Dkt. #1. She has filed a motion wherein she seeks "suppression of physical evidence confiscated by [law enforcement officials] pursuant to the execution of a search warrant" at her home located at 135 Shepard Street, Buffalo, New York on May 8, 2015. She also seeks "suppression of statements" made by her "in response to custodial questioning initiated by the arresting officer(s)." Dkt. #146, pp. 19-20, ¶s 81, 87. Lastly, she seeks "suppression of intercepted electronic wire communications." Dkt. #146, p. 23, ¶ 98.

The government has submitted its opposition to the requests of the defendant. Dkt. #165.

Oral argument on the defendant's motion was heard by this Court and the matter was taken under advisement.

# FACTS[1]

On May 7, 2015, this Court issued a search warrant authorizing the search of premises located at 135 Shepard Street, Buffalo, New York based on the sworn application and affidavit of Special FBI Agent Mark Schirching sworn to May 7, 2015 and a copy of the indictment attached thereto and marked Exhibit C wherein the defendant Berry is charged along with a number of co-defendants with having violated 21 U.S.C. § 846. Dkt. #15-M-40(1). This warrant was executed by law enforcement officers on May 8, 2015 and the defendant was arrested at that time. The search of the premises resulted in the seizure of a weapon, various drug paraphernalia, suspected drugs, ammunition, a safe and the sum of $13,501 from the safe. Dkt. #15-M-40(2).

After being arrested and taken into custody, the defendant was transported to the local FBI office where she was given *Miranda* warnings and an advice of rights by law enforcement officers. After being so advised, the defendant was

---

[1] The facts are taken from the papers filed in this case as they relate to the issues raised by the defendant in her motion.

interrogated for a period of time by law enforcement officers.  This interrogation was digitally recorded and the Court has reviewed that recording.[2]

On March 25, 2015, a Title III intercept Order was issued by the Hon. William M. Skretny authorizing the interception of wire communications on certain designated telephone facilities.  15-MR-29.

On April 14, 2015, Judge Skretny issued a Title III intercept Order for two additional telephone facilities that had not been listed in 15-MR-29.  *See* 15-MR-45.

The defendant was not named in the application and affidavits submitted in support of the Orders of March 25 and April 14 as an "interceptee" or "violator" and was not identified in any way as being a subscriber of the telephone facilities which were the targets of the aforesaid Orders.  Nevertheless, conversations of the defendant were intercepted and the government "concedes" that the defendant is an "aggrieved person" as defined in 18 U.S.C. § 2510(11) and therefore has standing to make her motion to suppress her statements. Dkt. #165, pp. 12-13.

## DISCUSSION AND ANALYSIS

In attacking the validity of the search warrant authorizing the search of 135 Shepard Street, the defendant asserts that the "application" for the warrant "is conclusory

---

[2] A copy of this recording had previously been given to the defendant by the government.

and lacks the necessary specificity concerning location of objects and/or contraband to be seized." Dkt. #146, p. 19, ¶ 78.  This assertion is totally without merit.

The affidavit of S.A. Schirching sworn to May 7, 2015 in support of the search warrant for 135 Shepard Street expressly states that "based on [authorized] intercepted [telephone] conversations, and observations made by surveillance personnel, it is believed that [co-defendant] Myers and his associates keep a small amount of cocaine base . . . at 135 Shepard Street, Buffalo, N.Y."  S.A. Schirching also states that "proceeds" from the "sales of narcotics" are left at 135 Shepard.  15-M-40, Dkt. #1, ¶ 11, 15(h)(i)(j)(k).

The sealed indictment attached to S.A. Schirching's affidavit of May 7, 2015 further establishes probable cause that the defendant, along with other named co-defendants, was engaged in the possession and distribution of narcotics in violation of 21 U.S.C. § 846.  15-M-40, Dkt. #1, pp. 44-45.

Therefore, it is recommended that the defendant's motion to suppress the evidence seized from 135 Shepard Street, Buffalo, New York on May 8, 2015 pursuant to this Court's search warrant dated May 7, 2015 be in all respects denied.

**B. Suppression of Intercepted Electronic/Wire Communications**

The government concedes that the defendant is an "aggrieved person" under 18 U.S.C. § 2510(11) so the defendant has standing to attack the use of her intercepted statements as evidence at trial. In her attack, the defendant claims that there was a "lack of probable cause in the application for the wiretap orders [15-MR-29] [15-MR-45]." Dkt. #146, p. 23, ¶ 98(a). She also asserts that "necessity" for such intercept orders was not established. Dkt. #146, p. 23, ¶ 98(c), 99.

Basically, the defendant is requesting that a review of Judge Skretny's decision in issuing the Intercept Orders of March 20 and April 14, 2015 be made so as to conclude that such orders were improperly issued. The role of this Court in conducting such a review is no different than that conducted by a court of appeals and therefore, the admonition of the Second Circuit Court of Appeals is appropriately applied in this process wherein the Court stated:

> "In reviewing a ruling on a motion to suppress wiretap evidence, we accord deference to the district court." *Miller*, 116 F.3d at 663 (quoting *Torres*, 901 F.2d at 231). Our role in reviewing the issuance of a wiretap order is not to make a *de novo* determination of the sufficiency of the application, "but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." *Id.*

*United States v. Diaz*, 176 F.3d 52, 109 (2d Cir.), *cert. denied* by *Rivera v. United States*, 528 U.S. 875 (1999).

This Court has reviewed the applications and affidavits submitted to the Hon. William M. Skretny in support of the request for intercept Orders 15-MR-29 and

5

15-MR-45 and concludes that the claims of the defendant attacking the validity of these Orders are without merit.

S.A. Schirching submitted a sixty (60) page affidavit sworn to March 20, 2015 in support of the application for intercept Order 15-MR-29 seeking authorization to intercept electronic communications made on a specifically referenced telephone facility which he claims was being used by specifically named "interceptees" and "violators" to violate 21 U.S.C. §§ 841, 846.  15-MR-29, pp. 2-3, ¶s 3-4.  S.A. Schirching also submitted an eighty-three (83) page affidavit in support of the application for intercept Order 15-MR-45 seeking authorization to intercept electronic communications made on specifically referenced telephone facilities which he claimed were being used by specifically named "interceptees" and "violators" to violate 21 U.S.C. §§ 841, 846.  15-MR-45, pp. 2-4, ¶s 3-4.  Admittedly the defendant is not named nor referenced in these affidavits of S.A. Schirching, but that is of no legal consequence in determining the validity of the intercept Orders, 15-MR-29, 15-MR-45, and whether there was probable cause established for the issuance of these Orders.

As the Second Circuit Court of Appeals has stated, "the standard probable cause applicable to [18 U.S.C.] § 2518 is the same as the standard for a regular search warrant.  Under *Illinois v. Gates*, 462 U.S. 213 (1983), probable cause for a search warrant is established if the totality of the circumstances indicate a probability of criminal activity.  *Id.* at 230-32; *United States v. Diaz, supra* at 110.

6

In his affidavit sworn to March 20, 2015, S.A. Schirching describes in great detail the alleged criminal activity that has taken place by the named "interceptees" and "violators." *See* paragraphs 12 through 44 of this affidavit. A similar detailed description of the criminal activities of the named "interceptees" and "violators" is set forth in paragraphs 12 through 77 of S.A. Schirching's affidavit sworn to April 14, 2015.

The facts set forth in S.A. Schirching's affidavits of March 20 and April 14, 2015 are more than "minimally adequate" to support Judge Skretny's determination that was made in the issuance of intercept Orders 15-MR-29 and 15-MR-45. Therefore, it is recommended that defendant's motion to suppress the evidence obtained through the use of those intercept orders because the orders lacked probable cause be denied.

As to the defendant's claim that proper "necessity" for the issuance of the intercept Orders of March 20 and April 14, 2015 had not been established, it is the finding of this Court that such claim is also without legal merit.

Since the holding in *United States v. Torres*, 901 F.2d 205 (2d Cir.), *cert. denied* 498 U.S. 906 (1990), addresses the issues raised by the defendant herein on the issue of whether 18 U.S.C. § 2518(1)(c) was complied with, it is worthwhile to sacrifice brevity and set forth that Court's ruling in detail.

> Section 2518(1)(c) requires that an application for such an interception shall include "a full and complete statement as to whether or not other investigative procedures have been

7

tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ." Similarly, section 2518(3)(c) requires the judge to whom an application for a wiretap is made to determine, as a condition of authorizing the tap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ."

The application for the wiretap in this case was based upon a thirty-six page affidavit by DEA agent Timothy J. Sullivan dated May 27, 1987. Flores contends that when the application for a wiretap was made, traditional law enforcement methods had already achieved "extraordinary success . . . in penetrating the deepest reaches of the Torres Organization," and that the "affidavit utterly failed to establish, even on a superficial level, that less intrusive techniques had not been successful and could not be successful." In advancing this position, Flores points out that our decision in *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), precludes the authorization of wiretaps based upon "generalized and conclusory statements that other investigative procedures would prove unsuccessful," *id.* at 104. Flores also argues that it does not suffice to show that a case belongs to some general class of cases which require wiretap investigation, citing *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975) (gambling case).

We are unpersuaded, and conclude that the application in this case provided a sufficient basis for authorizing the Flores wiretap. Section 2518 "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). As we have stated:

> "[T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."

*United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir. 1979) (quoting *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976)), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980); *see also United States v. Fury*, 554 F.2d 522, 530 (2d Cir), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

The role of an appeals court in reviewing the issuance of a wiretap order, furthermore, "is not to make a *de novo* determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.) (collecting cases), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977). And, as the *Scibelli* court went on to say:

> [I]n determining the sufficiency of the application a reviewing court must test it in a practical and common sense manner. The legislative history makes clear that section 2518(1)(c) is not designed to force the Government to have exhausted all "other investigative procedures".

9

> "The judgment [of the district judge] would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the showing be tested in a practical and commonsense fashion.
>
> S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, p. 2190 (citations omitted). *Scibelli*, 549 F.2d at 226.

*Id.* at 231-232) (brackets included); *See also United States v. Diaz. Supra 111.*

In his sixty (60) page affidavit sworn to March 20, 2015, S.A. Schirching describes in great detail the various investigative techniques that had been used as well as why normal investigative techniques "have been tried and failed" and/or "reasonably appear unlikely to succeed if continued or tried, or are too dangerous to employ in this investigation." 15-MR-29, ¶s 46-71.

In his eighty-three (83) page affidavit sworn to April 14, 2015, S.A. Schirching describes in great detail the various investigative techniques that had been

10

used as well as why normal investigative techniques "have been tried and failed" and/or "reasonably appear unlikely to succeed if continued or tried, or are too dangerous to employ in this investigation."  15-MR-45, ¶s 79-103.

Giving proper deference to Judge Skretny's review and acceptance of both of S.A. Schirching's affidavits sworn to March 20 and April 14, 2015 in support of the applications for the intercept Orders of March 20, 2015 (15-MR-29) and April 14, 2015 (15-MR-45), and his decision to grant both applications, it is concluded that Judge Skretny "properly found that conventional investigative techniques had been exhausted and that alternatives to wire interception would be unlikely to succeed or would be too dangerous."  Therefore, it is recommended that the defendant's motion to suppress be denied on her claim of lack of "necessity."

### C. Suppression of the Defendant's Statements

In her affidavit sworn to October 6, 2016 and submitted in support of her motion to suppress statements, the defendant claims that "any statements attributed to [her] by law enforcement must be suppressed from use at trial . . . based on a violation of [her] *Miranda* Rights and [her] due process rights guaranteed to [her] pursuant to the Fourteenth Amendment of the United States Constitution and [her] right to counsel pursuant to the Sixth Amendment of the United States Constitution."  Dkt. #146, p. 26, ¶ 4.  The defendant also claims in her motion to suppress that she was subjected to a "coercive and intimidating environment" and as a result, "she did not understand nor

11

were the ramifications of the waiver [of her rights] explained to her by the individuals who held her in custody or the persons who interrogated her." Dkt. #146, p. 21, ¶ 90.

It is axiomatic that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The government "bears the burden of demonstrating by a preponderance of the evidence that a defendant waived his constitutional rights." *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

The Court of Appeals for the Second Circuit has held that:

> An express written or oral waiver of constitutional rights is not necessary to establish a knowing and voluntary waiver of such rights. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A valid waiver may be inferred "from the actions and words of the person interrogated." *Id.*; *United States v. Rubio*, 709 F.2d 146, at 152 (2d Cir. 1983); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).

*United States v. Silva,* 715 F.2d 43, 49 (2d Cir. 1983).

> Miranda further recognized that after the required warnings are given the accused, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to

> demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S., at 475, 86 S.Ct., at 1628. We noted in North Carolina v. Butler, 441 U.S., at 373, 99 S.Ct., at 1757, that the question whether the accused waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. Miranda v. Arizona, 384 U.S., at 475–477, 86 S.Ct., at 1628–1629.

*Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979).

The Second Circuit Court of Appeals has stated:

> In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials. The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *Guarno,* 819 F.2d at 30. The second circumstance, the conditions under which a suspect is questioned, includes the place where an interrogation is held, *Mincey,* 437 U.S. at 398, 98 S.Ct. at 2416 ("It is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than [interrogation in a hospital's intensive care unit]."); *see also Bram,* 168 U.S. at 563, 18 S.Ct. at 194, and the length of detention, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. The presence or absence of counsel is a significant condition because counsel can "assure that the individual's right to choose between silence and speech remains unfettered

13

> throughout the interrogation process." *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625.
>
> The final and most critical circumstance for purposes of this appeal is the law enforcement officers' conduct. Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; whether there was physical mistreatment such as beatings, *see Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, *see Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; or even of clothing, *see Bram,* 168 U.S. at 561, 18 S.Ct. at 194 (suspect was taken to police detective's office and there "he was stripped of his clothing") for a prolonged period. In addition—as specifically raised in the instant case—such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

*Green v. Scully*, 850 F.2d 894, 901-902 (2d Cir. 1988).

I have reviewed the digital recording of the giving of *Miranda* warnings and advice of rights to the defendant which took place on May 8, 2015 while the defendant was held in custody. The defendant was brought into a small interview room at approximately 8:43 a.m. by two law enforcement officers who were not in uniform. At 8:46 a.m., one of the officers reads the *Miranda* warnings and advice of rights from a form, and after completing this reading of rights, he hands the same form to the defendant and requests her to read it. This is done at 8:46:31 a.m. The defendant reads the form and then signs it at 8:46:40 a.m. after being asked by the officer if she understood her rights and the defendant acknowledged that she did. At 8:46:55 a.m., the first officer signs the form as a witness, and at 8:47:10 a.m., the second officer signs as a witness. At 8:50 a.m. one of the officers leaves the room in order to get some

14

water for the defendant.  He returns at 8:50:14 a.m. and hands the water to the defendant.  No questioning has taken place up to this point.  At 8:50:38 a.m. the officer tells the defendant what she has been arrested for and asks the defendant how it came to be that the defendant was arrested.  Between 8:50:38 a.m. and 9:02:40 a.m. the defendant denies knowing anything about drugs or a gun that were found in her residence at 135 Shepard.  Much of the questioning is about the defendant's son Nathaniel and his associates.  The defendant constantly denies knowing anything except for "street talk" that she hears from neighbors and friends.  She denies knowing what her son is doing – she is just "taking care of her babies" – her grandchildren.  During this time period, the defendant cries and expresses concern about her son.  One of the officers tells her to drink some water.  At 9:02:40 a.m., the questioning stops and the defendant and the officers are sitting there in silence.  The defendant has her head in her hands and is sniffling.  At 9:07:46, the defendant gives out a deep sigh.  The officer tells her that she can help herself by telling them what she knows but the defendant replies at 9:08 that she "don't know nothing," and when told by the officer that she was under arrest, the defendant replies that she "didn't do nothing" between 9:08 and 9:09 a.m.

When the officer asks the defendant at 9:10:11 a.m. if there was "nothing that you can think of," the defendant states that in substance she tells her son that he is to keep whatever he is doing outside.  Between 9:11 and 9:14:08 a.m. the defendant describes her conversations with her son, none of which is of an incriminating nature.  At 9:15 a.m. one of the officers asks the defendant if she owns a gun.  The defendant

does not respond and sits quietly in the chair until 9:17 a.m. at which time she says she talks to her son every day to make sure he is O.K. At 9:18 a.m. she says that there are people in the neighborhood who do not like her son, because he "hangs out with friends who are from the Keystone neighborhood." At 9:20 a.m. the officer asks the defendant how she is involved in this and why was she at the location in the search warrant [135 Shepard]. At 9:22 a.m. the defendant tells the officers that three years ago her son was shot three times but she does not know who shot him.

From 9:24:50 a.m. to 9:32:35 a.m. there is no questioning and the defendant and two officers sit in silence. At 9:32:50 a.m. one of the officers asks the defendant if there is anything that she can think of to help herself to which there is no response by the defendant. At 9:34 a.m. the officer tells the defendant that they found a gun at her house to which the defendant replies that she doesn't know anything about a gun. During the period 9:34:50 a.m. and 9:42 a.m. there is no questioning and the defendant sits with her head in her hands and is crying. At 9:42 a.m. the officer tells the defendant to take a drink of water and both officers leave the room at 9:42:39. The defendant drinks the water and breathes heavily. At 9:43:26 the officers return to the room and tell the defendant that they are going to take her to court and a lawyer will be assigned to her. At 9:44:25 a.m. the officer tells the defendant that any information that she has and gives them will benefit her. Once again they ask the defendant if the gun found at 135 Shepard is hers to which she replies that she does not own a gun. At 9:46 a.m. the defendant is asked what her son's nickname is and she replies, "Stretch."

Between 9:47 a.m. and 9:54 a.m. the defendant repeatedly denies knowing anything about a gun and states that there should not be a gun in her house.

The interview then ends at 9:55:55 a.m. and the defendant is cuffed and removed from the room. The entire process of *Mirandizing* the defendant and interrogating her lasted for approximately one hour and ten minutes. In that same time period, approximately twenty-eight minutes involved no interrogation nor statements by the defendant. As a result, the actual interrogation of the defendant only lasted for approximately forty-two (42) minutes.

The conduct of the officers and their questions were not threatening. Their questioning of the defendant was not done in a repeated and/or prolonged nature, nor were any psychological, coercive techniques used by the officers in questioning the defendant such as "brain washing" or promises of leniency or other benefits. Telling the defendant that she "could help herself" does not fall into any of those categories. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied* 419 U.S. 1032 (1974); *United States v. Ferrara*, 377 F.2d 16, 17-18 (2d Cir.), *cert. denied* 389 U.S. 908 (1967).

A proper *Miranda* warning is not vitiated by assurances that cooperation would help the defendant. *United States v. Gaines,* 295 F.3d 293, 299 (2d Cir. 2002) (vague promises of leniency for cooperation will not generally warrant a finding of coercion). Moreover, once a defendant has been advised of her rights, government

17

agents are "free to discuss with [her] the evidence against [her] and the reasons why [she] should cooperate."  *United States v. Tutino,* 883 F.2d 1125, 1138 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990).

After the defendant was given *Miranda* warnings and advice of rights, the officers were free to discuss with the defendant the evidence that had been found in her residence at 135 Shepard Street upon execution of the search warrant authorizing the search of the premises.  *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989), *cert. denied* 493 U.S. 1082 (1990); *United States v. Ruggles, supra* at 265.

The defendant is a mature woman who demonstrated an understanding of what the law enforcement officers were saying to her.  She expressly acknowledged that she understood her rights after they were read to her by the officer and signed the advice of rights form which the officer used when reading those rights to her.  At no time during the interview did the defendant ask to speak to a lawyer or request an attorney.  The room in which the interrogation took place appeared to be a normal conference room containing a small table and three chairs.  The total time in the interview room was approximately one hour and ten minutes but actual interrogation of the defendant only lasted for forty-two minutes.  During this total time period, the defendant was not subjected to any physical deprivations.  In fact, the officer voluntarily provided the defendant with water, and during one of the defendant's crying spells, encouraged her to drink some water.

The questioning of the defendant by the officers was conducted in a civil and non-threatening way. It was not done in a prolonged way or in a repetitive way; nor were the questions put to the defendant in an overbearing way.

In considering all of these factors in their totality, it is concluded that the defendant made a knowing and voluntary waiver of her rights to remain silent after having been given *Miranda* warnings and advice of rights. At no time during the interview did she invoke her right to remain silent and stop the questioning. *See Berghuis v. Thompkins*, 560 U.S. 370, 384-385, 388-389 (2010); *United States v. Silva, supra* at 49. The statements made by her to the law enforcement officers were made voluntarily and without coercion. Therefore, it is recommended that defendant's motion to suppress her statements be in all respects denied.

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order**.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).   The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

DATED:   Buffalo, New York
         October 25, 2017

                                        *S/ H. Kenneth Schroeder, Jr.*
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**